# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES POEHMEL              :

                         :

           **Plaintiff**        :

      **v.**                     :      **3:10-CV-2372**

                         :      **(JUDGE MARIANI)**

AQUA AMERICA PENNSYLVANIA, INC. :

et al.,                          :

                         :

           **Defendants**      :

## MEMORANDUM OPINION

### I. Introduction

Before the Court are Defendant Commonwealth Engineering & Technology, Inc.'s

("CET") Motion for Summary Judgment (Doc. 45) and Defendant Aqua America's[1] ("Aqua")

Motion for Summary Judgment (Doc. 48). For the reasons that follow, the Court will grant

CET's motion and deny Aqua's motion.

### II. Statement of Undisputed Facts[2]

Plaintiff was working as a pipe layer on a water main replacement project when he

was involved in an incident on May 4, 2010. (Poehmel Dep., Doc. 46, Ex. A, at CET 6, 59).[3]

A portion of the trench wall he was digging collapsed, covering his right foot up to the middle

---

[1] For ease of reference, the Court will refer to Defendants Aqua America Pennsylvania, Inc., Aqua America, Inc., and Aqua America Inc. Pennsylvania as "Aqua" for the remainder of this opinion.

[2] The following statements of fact are truncated because the facts material to the motion involve whether Defendants owed Plaintiff a duty of care to ensure his safety. To the extent the Court cites to any facts in dispute, it will so note.

[3] Though Plaintiff and Defendant Aqua attached excerpts of depositions as exhibits, for uniformity, the Court will refer to all depositions by their CET paginations because Defendant CET submitted the complete depositions of all witnesses referred to by the parties' briefs.

of his calf with dirt and loose rock, causing him to sustain injuries. (*Id.* at CET 90-91). At the time the unshored trench wall collapsed, there was no trench box[4] in place. (*Id.* at CET 59-60). The other members of Plaintiff's crew at the time of the incident were Ivan Small, Steve Harrington, and Josh Whaley. (Smith Dep., Doc. 46, Ex. C, at CET 411-12).

The owner of the project was Defendant Aqua, the engineer was Defendant CET, and the contractor was Smith Site Development, LLC, Plaintiff's employer. (Aqua-Smith[5] Contract, Doc. 46, Ex. B, at CET 133, 182; Aqua-CET Contract, Doc. 50, Ex. B; Poehmel Dep., at CET 52).[6]

## III. Analysis

### a. Standard on Motion for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts

---

[4] A trench box is a large portable device that is placed within an excavated trench to prevent the sides of the ditch from caving in on workers. (Silvanic Dep., Doc. 46, Ex. M, at CET 1102-03).

[5] The successful bidder on the contract and the signatory to the Aqua-Smith contract was W&D Smith & Sons Construction, which sub-contracted the contracting work to Smith Site Development LLC. (Doc. 54. Ex. A). For ease of reference, the Court will refer to both the bidding party and the contracting party as "Smith."

[6] The terms of the Aqua-Smith Contract and Aqua-CET Contract speak for themselves, so the Court will not recite them at length here.

contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## b. Discussion

Under Pennsylvania law, "to state a cause of action for negligence, a plaintiff must allege facts which establish the breach of a legally recognized duty or obligation of the defendant that is causally connected to actual damages suffered by the plaintiff."
*Scampone v. Highland Park Care Ctr., LLC*, 2012 WL 5894904, at *12, -- A.3d -- (Pa. 2012).
Both Defendants argue they owed no duty to Plaintiff.

Plaintiff's principal arguments are that the contracts are ambiguous as to who was responsible for work-site safety and that each Defendant, through its course of conduct, acknowledged a duty of care toward Plaintiff. The undersigned examines Plaintiff's claims against each Defendant in turn.

## Defendant Aqua's Motion for Summary Judgment

### Did Aqua Retain Control?

"For over 100 years, the accepted and general rule regarding liability in our Commonwealth has been that a landowner who engages an independent contractor is not

3

responsible for the acts or omissions of such independent contractor or his employees."

*Beil v. Telesis Constr., Inc.*, 11 A.3d 456, 466 (Pa. 2011). As with any general rule,

however, there exist exceptions. Plaintiff relies on the "retained control" exception, set forth

in the Restatement (Second) of Torts and adopted in Pennsylvania (*id.*), which says:

> One who entrusts work to an independent contractor, but who retains the
> control of any part of the work, is subject to liability for physical harm to others
> for whose safety the employer owes a duty to exercise reasonable care,
> which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414. A comment to § 414 explains what entails

retention of control:

> the employer must have retained at least some degree of control over the
> manner in which the work is done. It is not enough that he has merely a
> general right to order the work stopped or resumed, to inspect its progress or
> to receive reports, to make suggestions or recommendations which need not
> necessarily be followed, or to prescribe alterations and deviations. Such a
> general right is usually reserved to employers, but it does not mean that the
> contractor is controlled as to his methods of work, or as to operative detail.
> There must be such a retention of a right of supervision that the contractor is
> not entirely free to do the work in his own way.

*Id.* at cmt. c. A plaintiff may establish that a defendant-owner retained control in one of two

ways: "[f]irst, a plaintiff may point to contractual provisions giving the premises owner control

over the manner, method, and operative details of the work. Alternatively, the plaintiff may

demonstrate that the land owner exercised actual control over the work." *Beil*, 11 A.3d at

467.

The *Beil* court noted that Pennsylvania's case law has construed this "retained

control" exception narrowly and when "the evidence fails to establish the requisite retained

4

control, the determination of liability may be made as a matter of law." *Id.* "Thus, the clear

focus of the Court with respect to control was on the substantive performance of the work."

*Id.* at 470.

## Aqua's Contractual Obligations

> In interpreting the language of a contract, we attempt to ascertain the intent of
> the parties and give it effect. When the words of an agreement are clear and
> unambiguous, the intent of the parties is to be ascertained from the language
> used in the agreement, which will be given its commonly accepted and plain
> meaning. Additionally, in determining the intent of the contracting parties, all
> provisions in the agreement will be construed together and each will be given
> effect.

*LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) (internal citations

and quotation marks omitted).

Article 6 (Contractor's Responsibilities) places broad responsibilities on the

Contractor (Smith), including the obligations to "supervise, inspect, and direct the Work

competently and efficiently." (Aqua-Smith Contract, Art. 6.01A, at CET 227). In fact,

"Contractor shall be solely responsible for the means, methods, techniques, sequences, and

procedures of construction." (*Id.*) Article 6.13 (Safety and Protection) explicitly places *all*

safety duties on Contractor:

> A. Contractor shall be solely responsible for initiating, maintaining and
> supervising all safety precautions and programs in connection with the
> Work. . . . Contractor shall take all necessary precautions for the safety of,
> and shall provide the necessary protection to prevent damage, injury or
> loss to: (1) all persons on the Site or who may be affected by the Work; . .
> .

5

B. Contractor shall comply with applicable Laws and Regulations relating to the safety of persons or property, or to the protection of persons or property from damage, injury, or loss; and shall erect and maintain all necessary safeguards for such safety and protection. . . .

C. Contractor shall comply with the applicable requirements of Owner's safety programs, if any. . . .[7]

D. Contractor shall inform Owner and Engineer of the specific requirements of Contractor's safety program with which Owner's and Engineer's employees and representatives must comply while at the Site.

E. (omitted)

F. Contractor's duties and responsibilities for safety and for protection of the Work shall continue until such time as all the Work is completed. . . .

(*Id*. at Art. 6.13(A, B, C, D, F), at CET 234-35). Furthermore, "Contractor shall designate a qualified and experienced safety representative at the Site whose duties and responsibilities shall be the prevention of accidents and the maintaining and supervising of safety precautions and programs." (*Id*. at Art. 6.14 (Safety Representative), at CET 235).

Consistent with the above provisions, Article 8.09 places corresponding "Limitations on Owner's Responsibilities." "The Owner [Aqua] shall not supervise, direct, or have control or authority over, nor be responsible for, Contractor's means, methods, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, . . ." (*Id*. at Art. 8.09(A), at CET 242).[8]

---

[7] According to the Supplement, there do not appear to be any Owner's safety programs. (*Id*. at Supp., at CET 273).

[8] *See also* Art. 8.12 (Compliance with Safety Program): "While at the Site, Owner's employees and representatives shall comply with the specific applicable requirements of Contractor's safety programs of which Owner has been informed pursuant to Paragraph 6.13.D." (*Id*. at CET 242).

Plaintiff, however, claims that there are internal inconsistencies within the Contract

and Supplement that create ambiguities and also raise genuine issues of material fact as to

the Contract's interpretation. As an example, Plaintiff points to Article 13.05 (Owner May

Stop the Work) for the proposition that Owner (Aqua) has the authority to stop work on the

project for failure to adhere to safety precautions. However, this is an inaccurate reading of

the Article, which says:

> If the Work is defective, or Contractor fails to supply sufficient skilled workers
> or suitable materials or equipment, or fails to perform the Work in such a way
> that the completed Work will conform to the Contract Documents, Owner may
> order Contractor to stop the Work, or any portion thereof, until the cause for
> such order has been eliminated.

(Id. at Art. 13.05, at CET 255). This Article gives Owner (Aqua) the option of stopping work

if the Contractor produces defective work or worked in a manner that does not conform to

the Contract's specifications. The authority to stop work is available only on grounds of

defective or untimely workmanship, which are unrelated to safety precautions, particularly in

light of the Owner's relinquishment of authority and control over the Contractor's "safety

precautions and programs incident to" as provided in Article 8.09, discussed earlier herein.

Plaintiff also relies on Article 6.01.A, which says, "Contractor shall not be responsible

for the negligence of Owner or Engineer in the design or specification of a specific means,

method, technique, sequence, or procedure of construction which is shown or indicated in

and expressly required by the Contract Documents" to show that Aqua is responsible for the

collapsed trench. (Id. at Art. 6.01.A, at CET 227). In addition, the Aqua-Smith Contract

7

calls for an unspecified party to "[p]rotect excavations by shoring, bracing, sheet piling, underpinning, . . . to prevent cave-ins or loose soil from falling into [the] excavation." (*Id.*, Section 02221 – Trenching, Part 1.4.B., at CET 355). Because the provision does not specify who bears the duty to protect excavations, Plaintiff claims that this creates a genuine issue of material fact as to the contract's interpretation. However, protecting excavations clearly falls under the umbrella of safety precautions, under § 6.13, which Smith bore exclusively, as confirmed by § 8.09. If Smith bore exclusive responsibility for work-site safety, then Aqua could not be responsible for negligently designing something it had no authority to construct.

Finally, Plaintiff points to a supplement to the contract which tasks the Contractor to "place special emphasis and attention on adhering to the safety requirements for" various OSHA standards.[9] (*Id.* at Supp., at CET 272-73). This provision weakens, rather than strengthens, Plaintiff's position because it is further authority that the duty to ensure a safe work-site rested with Smith.

Therefore, the Court finds there are no ambiguities within the Contract or Supplement. "Contractor shall be *solely* responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work." (*Id.* at Art. 6.13(A), at CET 234). Any obligations of the Owner (Aqua) to instruct Smith were limited to work specifications and did not overlap with any duty to ensure that proper safety

---

[9] Walking – Working Surfaces, Hazardous Materials, Process Safety Management Standard, Permit-required Confined Spaces, Lockout/Tagout, and Safety and Health Regulations for Construction.

8

precautions were followed. To interpret Aqua's oversight duties to include the assurance of safety would conflict with the explicit provisions of the Aqua-Smith Contract specifically placing all safety obligations on Smith. *See LJL Transp.,* 962 A.2d at 647.

### Did Defendant Aqua Retain Control?

The Court already has determined that the Aqua-Smith contract did not grant Defendant Aqua control over the manner, method, and operative details of the water main replacement project. So, Plaintiff must demonstrate that Defendant Aqua exercised actual control over the project.

The Court finds based on the testimony contained in numerous depositions that there is a genuine issue of material fact as to how much control Aqua exerted over the Project. Defendant Aqua cites a number of cases in which an owner-defendant's representatives appeared to exert some measure of control over safety or adherence to contract specifications, but in which the courts decided such control was insufficient to demonstrate that the owner-defendant retained control over the project. *See, e.g., Hader v. Coplay Cement Mfg. Co.,* 189 A.2d 271, 278 (Pa. 1963) (finding that although the hiring party's plant manager and vice president frequently visited the construction site, "there [was] not a scintilla of evidence that either . . . at any time gave, or attempted to give, any instructions as to the manner of installation of the crusher," and therefore "their presence was completely innocuous."); *LaChance v. Michael Baker Corp.,* 869 A.2d 1054, 1063 (Pa. Commw. Ct. 2005) (although the owner's field inspector allegedly directed Baker's

employees to grout outside of the pipe in question, "[h]ere, there is no evidence that

PennDOT instructed Baker's employees how to construct its trenches or how to do the job

when Baker's foreman was unavailable. . . . Their presence on the job site did not indicate

control, as that term is understood in SECTION 414."); *see also Warnick v. Home Depot*

*U.S.A., Inc.*, 516 F. Supp. 2d 459, 469 (E.D. Pa. 2007) (holding that "[e]ven if Home Depot's

assistant manager did 'instruct' Datatec employees on safety issues, . . . such instruction is

insufficient to meet the 'retained control' exception." Rather, because the plaintiff had "not

alleged that Home Depot instructed Datatec employees on how to install the network cables

or to walk on boards in the ceiling in the course of their work," Home Depot did not retain

control over the work.).[10]

Furthermore, in *Hader*, the owner-defendant, Coplay, employed one, Warfield, as a

"watchdog" for Coplay to ensure that its contractor "installed the crusher and erected the

housing in accordance with the plans and specifications. Such status in nowise conflicted

with control of the work by [the contractor]" even though Warfield had "showed the men how

to set the 'wear plates', how to set a 'precision pin' and how to see that the crusher fit."

*Hader*, 189 A.2d at 278. "[O]ne who employs an independent contractor may also employ a

person to ascertain that the work of the independent contractor is being done according to

plans and specifications and the employment of such person in no way indicates that the

---

[10] *Warnick* cited *Farabaugh v. Pa. Turnpike Comm'n,* 911 A.2d 1264, 1275 (Pa. 2006) in which the owner-defendant required "the contractor's employees to watch a safety video and hir[ed] a separate contractor specifically to supervise safety issues," which were measures "more pervasive than [in *Warnick*], and yet the court in *Farabaugh* concluded that the owner did not 'retain control' over the contractor's employees' work." *Id.* at 469-70.

independent contractor is being subjected to control." *Id.* Therefore, Plaintiff must show that Defendant Aqua, acting through its agents, exerted greater control than did the defendants in *Hader*, *LaChance*, and *Warnick*.

Plaintiff testified that he "was instructed to stop work at one point in time" by an Aqua employee because there were "no signs or flaggers at the end of an intersection." (Poehmel Dep., at CET 70). Plaintiff "was also instructed that [he] needed to make sure that the sidewalks were clean for pedestrians before leaving for the day." (*Id.*). In addition, Plaintiff was told "to make sure" that he "was using . . . metal wedges in the pipes when they're put together." (*Id.*). Plaintiff also received instruction on "how to get around [a] bend to make the tie-in" when making an angle cut. (*Id.* at CET 70-71). On one occasion, work stopped because some trees first needed to be cut. (*Id.* at CET 71). Finally, one time the workers had to shift a sign farther down a road so oncoming traffic could see it.[11] (*Id.*).

Whaley, another laborer, testified that Silvanic was often on site when Smith was absent. Counsel for Plaintiff asked, "when [Smith] wasn't there, would you agree the Aqua man was in charge?" Whaley responded, "Yeah. Well, he was there, just keeping an - - he's got a big job to do. He's got to check out guys, check his test, and then check the water. He's bouncing around." (Whaley Dep. I., Doc. 46, Ex. G, CET 749-50). Sometimes,

---

[11] Though Harrington's testimony generally confirmed Plaintiff's testimony, Harrington said "[The Aqua man] didn't tell me. You're stating he's telling me everything. He didn't tell me nothing." (Harrington Dep. II, Doc. 46, Ex. F, at CET 677). Counsel for Plaintiff then asked, "But you would hear him - - you heard him tell Adam, you go get the flags and the signs?" In response, Harrington said, "No, I did not hear him, to be honest with you." (*Id.*). Because Harrington neither had personal knowledge of what transpired between Smith and Silvanic nor ever received instructions directly from an Aqua representative, the Court does not consider his testimony in its decision.

Silvanic would retrieve parts and say, "you can use this piece, stuff that he had of his own." (*Id.* at 767).[12] In response to the question, "And [Aqua employees] tell you what to do?" Whaley said, "Yeah, how we can do that. They had tools and parts, too. They would help us." (*Id.* at CET 766).

Jim Summers, CET's representative, said that "at times, [Silvanic] come [*sic*] out and told [the laborers] they had to put some signs up when they were on the state highway, make sure they were up." (Summers Dep., Doc. 46, Ex. I, at CET 840). Silvanic did that "at least a half a dozen times. It could have been more." (*Id.*).

However, much like the cases cited above, these issues were related to ensuring that the work conformed to contract specifications, or were discrete events that do not demonstrate that Aqua retained control over the entire project. Furthermore, such safety issues related to ensuring that sidewalks were clean for pedestrians are so tangential to any work related to trench-digging as to be of no value to Plaintiff's claim.

Nevertheless, other testimony demonstrates that in this case, Aqua's control may have been greater than isolated demonstrations of how to perform work or reminders of safety precautions. For example, Adam Smith, the project Superintendent, confirmed

---

[12] The rest of Whaley's testimony would not support the existence of a material fact as it was equivocal at best. For instance, in response to the question, "the Aqua man told you" the crew needed to use a trench box, Whaley said, "I don't know who said that, so I can't say. I have no idea who said that, but I'm a laborer. I go there to work. The trench box is supposed to be used, yes. That's what we were told. I just don't know who said it first." (*Id.* at CET 761). In response to the question, "Would you agree that when . . . [Smith] wasn't there, one of the Aqua men was in charge?" Whaley responded, "Yeah, I guess. I wouldn't - - I don't know. I wouldn't say they're in charge." (*Id.* at CET 765). However, he did confirm Plaintiff's counsel's question that "they would tell you what to do if they didn't like what you were doing, right?" (*Id.*). In response to the question of whether Silvanic was the "big guy" or the "big shot," Whaley said, "I really wouldn't know, but, yeah, I guess so. They said Andy was the big guy, but I don't know here from there." (*Id.* at 767).

12

counsel's question that "Aqua Penn" had the "final say on what to do." (Smith Dep., at CET 427).

The key testimony is that of Andrew Silvanic, Aqua's Operations Manager on the Project. In response to counsel's question, "would you agree that in terms of this project . . . CET Engineering Services was acting as the Aqua representative . . . ?" Silvanic answered, "Yes. But I have overall control of it. If there's a question out there on the water system, the inspectors would call me." (Silvanic Dep., at CET 1111). Silvanic further elaborated, "If they ran into a problem, which they do, there's something there that is an unknown, a pipe or a manhole or something like that, they would call me and say can you come out to the job." (Id. at CET 1111-12). Silvanic also sometimes did the work of an RPR and observed the construction work. (Id. at CET 1173) ("I worked, I was there as an Aqua inspector when a CET inspector was unavailable.").

Though there is also conflicting testimony that Silvanic's role was to observe,[13] that he had no authority over how Smith dug trenches,[14] that he had no authority to stop work,[15] and that Small, the foreman, was in charge when Adam Smith was away,[16] these inconsistencies are matters left for a jury to resolve at trial.

Taking all reasonable inferences in favor of Plaintiff, testimony shows that Aqua retained a measure of control over the "manner, method, and operative details of the work."

---

[13] (Summers Dep., at CET 860).
[14] (Smith Dep., at CET 486-87); (Small Dep., Doc. 46, Ex. D, at CET 512).
[15] (Silvanic Dep., at CET 1127).
[16] (Id. at CET 1129); (Harrington Dep. II, at CET 640).

13

See *Beil*, 11 A.3d at 467. The testimony creates an issue of material fact, in part, because of the identity of the speakers: namely, the project Superintendent and Aqua's Operations Manager.

## Defendant CET's Motion for Summary Judgment

### Contractual Obligations

"Whether a duty exists under a particular set of facts is a question of law." *Herczeg v. Hampton Twp. Mun. Auth.*, 766 A.2d 866, 871 (Pa. Super. Ct. 2001). Pennsylvania courts "have consistently refused to impose a duty on design professionals to protect workers from hazards on a construction site unless there was an undertaking, either by contract or course of conduct to supervise or control the construction and/or to maintain safe conditions on the site." *Id.*

The Court first examines the Aqua-CET Contract to determine how the parties to the contract allocated their respective obligations. Under the terms of the Aqua-CET Contract,

Engineer shall not . . . supervise, direct, or have control over the Work, nor shall Engineer have authority over or responsibility for the means, methods, techniques, sequences, or procedures of construction selected by Contractor, for safety precautions and programs incident to the Work, or for any failure of Contractor to comply with Laws and Regulations applicable to Contractor's furnishing and performing the Work. Accordingly, Engineer neither guarantees the performance of any Contractor nor assumes responsibility for any Contractor's failure to furnish and perform its work in accordance with the Contract Documents.

(Aqua-CET Contract, Schedule of Engineer's Services, Ex. A, Art. 1.05(A)(6)(b), at 5).

Furthermore, "Engineer shall not be responsible for the acts or omissions of any Contractor,

14

or of any of their subcontractors, . . . performing or furnishing any of the Work. Engineer shall not be responsible for failure of any Contractor to perform or furnish the Work in accordance with the Contract Documents." (*Id.* at Art. 1.05(C), at 7).

As part of its contractual duties, CET was required to "furnish a Resident Project Representative ("RPR"), assistants, and other field staff to assist Engineer in observing progress and quality of the Work." (Aqua-CET Contract, Schedule of Duties, Responsibilities, and Limitations of Authority of Resident Project Representative, Ex. D, at Art. D.101(A), at 1). The general scope of the RPRs' duties was virtually the same as Engineer's:

> Engineer shall not, . . . supervise, direct, or have control over Contractor's work[,] nor shall Engineer have authority over or responsibility for the means, methods, techniques, sequences, or procedures selected or used by Contractor, for security or safety at the Site, for safety precautions and programs incident to Contractor's work in progress, for any failure of Contractor to comply with Laws and Regulations applicable to Contractor's performing and furnishing the Work, or responsibility for Contractor's failure to furnish and perform the Work in accordance with the Contract Documents.

(*Id.* at Art. D.101(B)). However, RPRs had additional limitations placed on them:

> Resident Project Representative shall not:
>
> . . .
>
> 2. Exceed limitations of Engineer's authority as set forth in the Agreement or the Contract Documents.
>
> 3. Undertake any of the responsibilities of a Contractor, subcontractors, suppliers, or a Contractor's superintendent.

15

4. Advise on, issue directions relative to, or assume control over any aspect of the means, methods, techniques, sequences or procedures of the Contractor's work unless such advice or directions are specifically required by the Contract Documents.

5. Advise on, issue directions regarding, or assume control over safety practices, precautions and programs in connection with the activities or operations of Owner or Contractor.

(*Id.* at Art. D.101(D)(2)-(5), at 4-5). One of the duties of an RPR was to "[p]repare a daily report or keep a diary or log book, recording . . . daily activities, decisions, observations in general, and specific observations . . ." (*Id.* at Art. D.101(C)(10)(b), at 3).

The Aqua-CET Contract unambiguously states that CET shall have no control over Smith's work and that this lack of authority extends to safety precautions. Therefore, under the plain terms of the Aqua-CET Contract, CET owed Plaintiff no duty to ensure his safety. Furthermore, the Aqua-Smith Contract is consistent with the Aqua-CET Contract. Though CET, as a non-party to the Aqua-Smith Contract, obviously is not bound by it,[17] the Aqua-Smith Contract confirms that CET was not contractually responsible for worker safety.

Under the Aqua-Smith Contract, "Contractor shall be *solely* responsible for the means, methods, techniques, sequences, and procedures of construction." (Aqua-Smith Contract, Art. 6.01A, at CET 227). Article 6.13 (Safety and Protection) explicitly places *all* safety precautions on Contractor. "Contractor shall be *solely* responsible for initiating,

[17] "It is a well-established principle of law that a contract cannot impose obligations on one who is not a party to the contract." *ABG Promotions v. Parkway Publ'g, Inc.*, 834 A.2d 613, 618 (Pa. Super. Ct. 2003) (internal citations and quotation marks omitted).

16

maintaining and supervising all safety precautions and programs in connection with the Work. . . ." (*Id.* at Art. 6.13(A), at CET 234).

Moreover, the Aqua-Smith Contract is nearly identical in its language outlining CET's roles and responsibilities. Article 9.01 (Owner's Representative) says: "Engineer will be Owner's representative during the construction period. The duties and responsibilities and the limitations of authority of Engineer as Owner's representative during construction are set forth in the Contract Documents." (*Id.* at CET 242). Those limitations of authority are, "Engineer will not supervise, direct, control, or have authority over or be responsible for Contractor's means, methods, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, . . ." (*Id.* at Art. 9.09(B), at CET 245).

Plaintiff points to the Supplement, which purportedly vested CET's on-site representative with the authority to ensure that safety precautions were followed. That particular provision states:

> The Resident Project Representative (RPR) will be Engineer's employee or agent at the Site, will act as directed by and under the supervision of Engineer, and will confer with Engineer regarding RPR's actions. RPR's dealings in matters pertaining to the Work in general shall be with Engineer and Contractor. RPR's dealings with Subcontractors shall be through or with the full knowledge and approval of Contractor.

(*Id.* at Supp. Art. 9.03(B), CET 273-74). This provision says nothing about whether the RPRs had any authority over Smith's work or worker safety. Rather, the Supplement restricted the RPR's authority and specifically said:

> The RPR shall not:

17

. . .

2. Exceed limitations of Engineer's authority as set forth in the Contract Documents.

3. Undertake any of the responsibilities of Contractor, . . .

4. Advise on, issue directions relative to, or assume control over any aspect of the means, methods, techniques, sequences or procedures of Contractor's work unless such advice or directions are specifically required by the Contract Documents.

5. Advise on, issue directions regarding, or assume control over safety practices, precautions, and programs in connection with the activities or operations of Owner or Contractor.

(*Id.* at Supp. Art. 9.03(C), CET 276).

Plaintiff argues that Article 3 (Engineer) of the Aqua-Smith Contract raises a point of

ambiguity which must be resolved by the jury at trial. Article 3 states: "The Project has been

designed by CET Engineering Services (Engineer), which is to act as Owner's

representative, assume all duties and responsibilities, and have the rights and authority

assigned to Engineer in the Contract Documents in connection with the completion of the

Work in accordance with the Contract Documents." (*Id.*, Art. 3.01, at CET 0182). Because

the Aqua-Smith Contract placed the duty of ensuring a safe work site on Smith, the Court

does not see how CET would be under any obligation to assume a duty toward Plaintiff by

acting as Aqua's representative. What duties Aqua did have were explicitly separated from

any duties to ensure that safety precautions were followed.

18

Therefore, despite Plaintiff's arguments to the contrary, *Herczeg* controls this case. In *Herczeg*, the Pennsylvania Superior Court rejected the plaintiff's argument that the engineer owed her a duty of care "for the safety of the general contractor's workers. . . . She submits this is true even where the contract places the responsibility for safety on the general contractor and the engineer's plans and specifications did not create the dangerous conditions. We cannot agree." 766 A.2d at 872. *Herczeg* is so similar to this case, that one could simply substitute the parties' names in the analysis. "[CET] had no contractual agreement with [Aqua] or [Contractor] to supervise the work or provide safety oversight." *Id.* at 873. "[CET] had no opportunity or capacity to exercise control over the manner or means by which plaintiff chose to perform the trenching work. To the contrary, pursuant to the contract documents, the control of the work, and the safety of the workers fell squarely upon the contractor." *Id.* at 874.

> [W]e reject any notion that a duty arises based solely upon an engineer's actual knowledge of dangerous conditions.[18] Stated another way, such knowledge, in and of itself, does not create a tort duty. The decisions of the appellate courts of this Commonwealth concerning a design professional's duty are not dependent upon the presence or absence of actual knowledge of unsafe working conditions. We believe such a notion adds nothing new to the duty analysis. If someone is under no legal duty to act, it matters not whether that person is actually aware of a dangerous condition. Conversely, if someone by contract or course of conduct has undertaken the responsibility for worker safety that person may still be liable even in the absence of actual knowledge of the dangerous condition if they should have known of the condition. "Actual knowledge" in our view merely relates to the element of the foreseeability of the risk of harm. . . . Even assuming, as we must, that [CET]

---

[18] Plaintiff argues that *Herczeg* does not apply because his theory of liability is that CET took steps to prevent safety hazards. Therefore, not only was it aware of safety defects, through its RPRs, it acted on its awareness. *Herczeg* addresses and dismisses any such argument.

had actual knowledge of the unsafe nature of the trench, it does not follow that we must hold [CET] responsible for the safety of the construction workers where those responsibilities were expressly undertaken by the contractor. This is especially true where the facts do not indicate the engineer took any actions that can be construed as impliedly assuming responsibility for construction-site safety.

*Id.* at 874 (internal citations omitted). *Marshall v. Port Auth. of Allegheny Cnty.* provides

even stronger support for the argument that an engineer owes the plaintiff no duty of care

even though the contract vests the engineer with the authority to stop work for safety

reasons. 568 A.2d 931 (Pa. 1990).

in the event [Smith] failed to comply with such standards, where "such failure create[s] a hazard to life, limb or property, the Engineer *may* stop any operation of the Contractor affected by the failure until the failure is remedied." General Provision 4.11.5. Clearly, under the [Aqua-Smith] agreement, the engineering firm, [CET], was *permitted* to take action against perceived safety hazards. Although this authority was given to [CET], the [Aqua-Smith] contract also provided that [Smith] "shall supervise and direct" the work and "be solely responsible for all construction means, methods, techniques, sequences and procedures...." General Provision 6.4.1. The determinative question is not, however, whether [CET] *could* have acted to prevent the instant accident, but rather whether it had a *duty* to do so.

*Id.* at 936 (emphasis in original). In addition, the owner-engineer contract placed a duty on

the engineer "to assure delivery of the specified systems and facilities in accordance with

contract drawings and specifications." *Id.* The Court construed the owner-engineer contract

to mean only as "a duty upon [CET] to assure that the finished product for which [Aqua]

bargained would comply with the design drawings and specifications." *Id.* CET was to have

RPRs on site for the purpose of making certain that the project was performed within the

project specifications. CET was not, under the contract, responsible for the means and methods of performance of the installation of the subject water mains.

Ultimately, the Pennsylvania Supreme Court concluded in *Marshall* that the engineer did not owe a duty to the plaintiff. "To hold otherwise, by imposing a duty on [CET] to be actively involved in procedures for safety compliance, would be inconsistent with the provision in the [Aqua-Smith] contract stating that [Smith] 'shall supervise and direct' the work and be '*solely* responsible for all construction means. . . .' " *Id.* (emphasis in original). Therefore, as a matter of law, CET was under no contractual obligation to Plaintiff to ensure his safety.

## CET's Course of Conduct

As stated before, Pennsylvania courts "have consistently refused to impose a duty on design professionals to protect workers from hazards on a construction site unless there was an undertaking, either by contract or course of conduct to supervise or control the construction and/or to maintain safe conditions on the site." *Herczeg*, 766 A.2d at 871. The Court has already determined that there was no contractually-created duty on CET. Nevertheless, Plaintiff contends that by a course of conduct, CET acknowledged that it owed Plaintiff the duty to ensure a safe work-site.

Plaintiff cites to isolated portions of deposition testimony from various Smith, Aqua, and CET employees. However, when read in their full context, none of these statements support a finding that there is a genuine issue of material fact over whether CET owed a

duty of care to Plaintiff by adopting a course of conduct that evidenced an assumption of such a duty.

Adam Smith, the project Superintendent, acknowledged that pursuant to the contract, site safety rested with the Contractor. (Smith Dep., at CET 392, 395-96) ("Every contract agreement that I've ever been involved in over the years, the contractor is responsible for his own safety," which included the safety of employees.). As the project Superintendent, Smith made decisions regarding the trench digging Plaintiff did and supervised his crews. (*Id.* at CET 401). Smith never turned supervisory responsibility of his work crews over to Terry Cockroft or Jim Summers, who were CET's representatives[19] on the work-site. (*Id.* at CET 419; Small Dep., at CET 521; Whaley Dep. II, Doc. 46, Ex. H, at CET 808; Summers Dep., at CET 842).

Plaintiff points to selective portions of foreman Ivan Small's testimony to show that CET exerted control over the project's work. In response to Plaintiff's counsel's question, foreman Ivan Small confirmed that CET inspectors (Summers and Cockcroft) were in charge of what he did. "They would tell Adam [what to do], and then Adam would tell us." (Small Dep., at CET 511). However, Small was not there when the CET RPRs would go over the plans with Smith. (*Id.* at CET 544) ("Not verbally with them, no."). As far as Small's direct encounters with the CET RPRs, he answered that as far as he knew, they did not tell him or any other crewmen what to do. (*Id.* at CET 514). Because Small did not

---

[19] (Cockcroft Dep., Doc. 46, Ex. K, at CET 971; Summers Dep., at CET 829).

22

have a foundation for his statement that CET told Smith what to do, his testimony is of negligible value with respect to the extent, if any, of CET's control over the project. Small also agreed with counsel that "if a problem did come up and Adam wasn't there, the go-to person would be Terry or Jim Summers." (*Id.* at CET 544). Simply because Cockcroft or Summers might be "go-to" people when Small's supervisor was absent does not mean that CET representatives had actual control of the project. Later, he said, "Adam was our boss, that's who we listened to. . . .You know, that's who we worked for." (*Id.* at CET 547).

In response to the question, "Adam listened to Jim Summers and Terry Cockcroft as to, you know, when they told him stuff?" Small responded, "I would say that Adam would talk with Andy or Terry, the ones in charge of the project." (*Id.*). "If they had something, or if they stopped progress or whatever, I guess, yeah, I guess I would have to listen to them." (*Id.* at CET 548). However, despite Small's answer to this hypothetical scenario above,[20] Adam Smith never placed Small under the authority of either Summers or Cockcroft. (*Id.* at CET 521). Rather, Small testified that the CET "inspectors" never told him what to do, and that as far as he was aware, they did not tell crewmen what to do. (*Id.* at CET 514, 518-19). Adam Smith was in charge, and Small listened to Adam. (*Id.* at 517).

The testimony of CET's RPRs dovetails with the testimony of the Contractor witnesses, Smith and Small. Summers testified that he "visually looked at [the work] to make sure it was right, but" was "not an inspector." (Summers Dep., at CET 836). Rather,

---

[20] Small could not recall a time when the CET "inspectors" ever stopped the crew from working. (*Id.* at CET 517).

23

his "job was to make sure that [Smith] used the right material and the right pipe and the right size," and to keep "track of the quantities of pipe they used and the width of the ditch." (*Id.* at CET 837). In other words, his job was to ensure that the work followed the contract specifications. Summers testified that he believed he participated in installing a "bend" on April 20, 2010, though he did could not "recollect that" and did not remember giving the workers any instructions on how to do it. (Summers Dep., at CET 862-63).

However, Summers stated that all he could was make suggestions about using a trench box. "I could suggest, but then it was still up to them whether they did or not. And if they didn't, all I would do is I could call Mr. Silvanic or not that this is what they did." (*Id.* at CET 839). For instance, on one occasion, Summers told Silvanic that the workers had not put silt bags in the catch basins. "I told something to Mr. Silvanic and they put them in." (*Id.* at CET 873). Silvanic confirmed Summers's testimony that all the RPRs could do was make suggestions regarding work methods or safety precautions. If the RPRs felt there should be additional flagmen on duty, they could "tell whoever is in charge of the job at that time, hey, you know, you probably should get some flagmen out here. They wouldn't be able to stop the job because of it. They could inform them, but that would be it." (Silvanic Dep., at CET 1128). Again, these statements support Defendants' arguments that the most CET's RPRs could do was make suggestions with respect to safety.

Summers also "suggested" to Adam Smith that Smith use a trench box in an excavation ditch that was more than five feet deep, but Adam Smith ignored him.

(Summers Dep. at CET 885-86).[21] "[Smith] wasn't going to answer me because I was not an inspector. The only thing I could do was suggest and if he wanted to use it, he would use it." (*Id.* at CET 846). Though safety was under the Contractor's purview, Summers noted the Contractor did not use a trench box in his RPR journal "because if something happened, to protect myself that they didn't use this and they should have been using it, but that's still up to their foreman [Small] on the job." (*Id.* at CET 886). Adam Smith corroborated the RPR testimony that CET's RPRs could suggest adjustments or modifications, and if it made sense, he would implement the suggestions. However, he said that CET's RPRs did not have the authority to instruct him what to do because of "the way the contract was written." (Smith Dep., at CET 420). Smith also testified that when circumstances forced him to alter the digging plans, he conferred with the RPRs, but they did not tell him where to lay the path out. (Smith Dep., at CET 426-27) (the RPR "wasn't telling me what to do. We were discussing it.").

Cockcroft, CET's other RPR, testified that he also requested Small put up more signs, which Small did. (Cockcroft Dep., at CET 988). However, Small ignored Cockcroft's suggestion that additional flagmen be used and ignored the suggestion to use a trench box. (*Id.* at CET 989-90). Small responded that there simply was no room for the trencher in the hole because of the gas main, water main, and sewer line. (Small Dep., at CET 525-26).

---

[21] Elsewhere, Summers stated: "I have to suggest to them that it needs to be at least five foot of cover and that's what I suggested, it had to be at least five foot. I could suggest it and that's all I could do." (*Id.* at CET 838). He could also suggest that they stop work, but it was not his ultimate decision. (*Id.* at CET 839) ("I could suggest, but then it was still up to them whether they did or not. And if they didn't, all I would do is I could call Mr. Silvanic or note it that this is what they did;" *see also* CET 842, 846, 864, 873-75).

Cockcroft then recorded, "Reminded the excavator operator foreman Ivan, contractor responsible for job safety at all times. Need a trench box and ladder. None in use this day." (Cockcroft Dep. at 989).[22]

Thus, though Plaintiff is correct that Summers and Cockcroft made a number of suggestions that were relevant to worker safety, they were merely suggestions or remarks, *not* orders. Consistent with the Aqua-Smith Contract, decisions with respect to safety rested with Smith. That Summers and Cockcroft made notations in their daily journal that the Contractor ignored their suggestions does not show CET owed a duty to Plaintiff. In fact, the notation specifically says he reminded the Contractor that it was Smith's duty to ensure work-site safety, thereby disclaiming any assumption of responsibility for safety practices. Rather, the Contractor's decisions to ignore many of CET's safety suggestions demonstrate that CET did not have control over the project.

Plaintiff also points to Silvanic's statement that CET's RPRs had the authority to instruct the men to stay late to clean up the work site at the end of the day, though the RPRs could not tell them to stop work and Aqua "didn't have any control over the safety." (Silvanic Dep., at CET 1127, 1140). Though CET's RPRs may have had the limited authority to instruct crew members to clean up the work site at the end of each day, this falls short of showing that they exerted control over the project itself.

---

[22] Plaintiff submits that Steven Harrington testified that though he did not see Ivan seek and/or obtain approval from Jim Summers to depart from the plan specifications, it was his understanding that was what happened. Aside from the Court's determination that this statement does not create a genuine issue of material fact, the Court finds this testimony would be inadmissible at trial for lack of a foundation, and so, will not consider it on Defendants' Motions for Summary Judgment.

Cockcroft also said that the engineer and Silvanic would change work plans "on occasion." (Cockcroft Dep., at CET 1022-23). Such changes might "come out as an addendum or a natural change order or there may be a price difference or they may add a pay item, but it would come from the CET office to the contractor." (*Id.* at CET 1024). How such changes in pricing might affect Plaintiff's work as a pipe-layer or how this shows that CET had control over Plaintiff's work is unclear. Though CET did appear to have some control over minor departures from the contract's *specifications*, it was not to such a degree that it deprived Smith of control over its own work *methods*. *See Marshall*, 568 A.2d at 936 ("the [Aqua-CET] contract must be understood as imposing a duty upon [CET] to assure that the finished product for which [Aqua] bargained would comply with the design drawings and specifications.").

The full context of the depositions shows that the crew members took orders from no one from CET, including any instructions regarding safety and work methods or techniques.[23] The most that CET's RPRs could do was make suggestions regarding safety and point out areas in which the work was not progressing according to contract specifications. At no point did CET ever exert actual control over the work's operations, means, or methods, nor did CET participate in the work's progress. The evidence shows that CET carefully observed its role as set forth in the Aqua-CET Contract and did no more

---

[23] Plaintiff specifically testified that Aqua employees instructed him to stop work on a number of occasions (Poehmel Dep., at CET 70-73), and he argues in his briefs that Summers and Cockcroft were among those Aqua employees, even though he admits he never heard of CET (*Id.* at CET 61). Even assuming that Summers or Cockcroft did instruct Plaintiff to stop work so additional flagmen could be posted or that they instructed him to clean the sidewalk at the end of the work day, for the same reasons cited above, this acts do not show CET exerted actual control over the project such that Smith was no longer in charge.

than it was contractually obligated to do. As the *Herczeg* court recognized, "an [engineer]

does not, by reason of his supervisory authority over construction, assume responsibility for

the day-to-day methods utilized by the contractor to complete the construction." 766 A.2d at

872 (citing *Balagna v. Shawnee Cnty.*, 668 P.2d 157 (Kan. 1983)). Rather, its "basic duty is

to see that [the] employer gets a finished product which is structurally sound and which

conforms to the specifications and standards." *Id.* Therefore, the Court will grant CET's

motion for summary judgment and enter judgment in its favor.

## IV. Conclusion

For the foregoing reasons, CET's Motion for Summary Judgment (Doc. 45) will be

granted but Aqua's Motion for Summary Judgment (Doc. 48) will be denied. A separate

Order follows.

Robert D. Mariani
United States District Court Judge